IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:05-CR-500 DB |
| Plaintiff, | : | REPORT AND RECOMMENDATION |
| vs. | : | |
| | | JUDGE DEE BENSON |
| JEREMY ARRINGTON, | : | |
| | | MAGISTRATE JUDGE BROOKE C. |
| Defendant. | | WELLS |

Before the court is Defendant, Jeremy Arrington's, motion to suppress. Jeremy seeks to suppress evidence obtained from the search of his motel room.[1] Defendant argues that the search of his motel room based upon the consent of Jennifer Arrington, his estranged wife, violated his rights under the Fourth Amendment. And, Jennifer did not have actual or apparent authority to consent to the search. The Government argues that the officer had apparent authority to enter the motel room and search.

Oral arguments were held on March 21, 2006.[2] Following the hearing, the court

---

[1] Initially Defendant also sought to suppress the statements he made to police. The Government however, has agreed not to use any statements made by Defendant against him.

[2] The court took the matter under advisement on May 17, 2006 following receipt of the transcript from final arguments.

1

requested supplemental briefing on two issues. First, whether the court, *sua sponte*, could decide the suppression issue on a theory not raised by the government. And second, whether exigent circumstances justified the officers warrantless search of Defendant's motel room.

## FACTUAL BACKGROUND

On May 2, 2005 Jeremy Arrington went to see his estranged wife, Jennifer Arrington at her place of employment which was located at the Harmon Building in West Valley City. (Tr. 8-9).[3] Jennifer agreed to accompany Jeremy on a drive to discuss the possibility of reconciling their relationship. (Tr. 8-9). Jeremy drove the car while Jennifer sat in the passenger seat. Jeremy's mother, Pansy Arington, sat in the back seat and accompanied the couple. (Tr. 10). The three of them drove to Jiffy Lube where Jennifer and Jeremy got out of the car and had a cigarette while Pansy remained in the vehicle. (Tr. 10). As they were smoking Jennifer told Jeremy that she had "cheated on him." (Tr. 10). Jeremy became upset. He pulled a small pocket knife from his pocket and stabbed himself in the forearm. (Tr. 11).

The couple got back into the car and drove to a nearby mall. Pansy went into the mall while Jeremy and Jennifer waited for her in the car. (Tr. 12). At some point while they were discussing their relationship Jeremy exited the vehicle, got into the trunk, pulled out a gun, and asked Jennifer to shoot him. (Tr. 12-13). Jennifer refused. (Tr. 13).

Eventually, Pansy returned to the car and they all drove to the La Quinta Inn to get a hotel room so Jeremy and Jennifer could discuss their relationship further. (Tr. 13-14). Jennifer paid for the room with cash. (Tr. 14). But neither Jennifer nor Jeremy had ID which is required by La

---

[3] Tr. designates the transcript from a hearing held on January 9, 2006. Tr.2 designates the transcript from final arguments which were held on March 21, 2006.

Quinta to rent a room. (Tr. 14). So Pansy Arrington helped the couple check-in by using her ID. (Tr. 15). Jeremy was given a key to the room. (Tr. 15). The room was rented in the name of Pansy Arrington. Pansy left the hotel and Jennifer and Jeremy went inside to talk. (Tr. 15).

Jeremy took his bags up to the room while Jennifer took her purse and cellphone. (Tr. 16). While they were talking Jennifer received a phone call on her cell phone from her father. (Tr. 16). Her father asked where she was and if she was all right. Jennifer's father said he was coming to get her and that she was to meet him in the lobby. (Tr. 17). When her father arrived Jennifer was not in the lobby so he went upstairs to get her. (Tr. 17). As Jennifer was leaving the room Jeremy held a gun up to his head and told her that if she left him he would shoot himself. (Tr. 17-18). Jennifer told her father that Jeremy had threatened suicide and that she wanted to return to the room, but her father insisted that she accompany him out to his car and she complied. (Tr. 18, 33). Jennifer and her father drove to a nearby parking lot and called the police. (Tr. 18-19).

Jennifer testified that she did not intend to stay in the room but only went up to briefly talk with Jeremy. (Tr. 30, 40). Jennifer had been inside the room for approximately 20 minutes when her father arrived to get her. (Tr. 40).

Shortly after Jennifer left, Jeremy went down to the front desk and asked that Jennifer's name be removed from the guest registry. (Tr. 60). Jeremy then left the hotel and began walking westward on 3500 south in the direction of the Harmon Building. (Tr. 47, 55).

At approximately 3:42 p.m. that afternoon, Officer Frank Venditti of the West Valley Police Department was dispatched to locate a "man with a gun." This was in response to Jennifer's call. Another officer spotted someone matching Jeremy's description walking along

3500 south and notified Venditti. Venditti located Jeremy approximately a half mile west of the La Quinta Inn. (Tr. 47). Venditti and a couple of other officers cautiously approached Jeremy because of the information about an alleged gun. (Tr. 48). Venditti told Jeremy to keep his hands in plain sight and Jeremy complied. Venditti noticed that Jeremy was bleeding from his forearm. (Tr. 48). Venditti placed him into handcuffs for "everybody's safety." (Tr. 48). As Venditti was putting the handcuffs on Jeremy, Jeremy told Venditti that he had stabbed himself with a knife that was in his right front pocket. Venditti confiscated the knife. (Tr. 48-49).

After Venditti had detained Defendant he called for an ambulance to treat Jeremy's wound. (Tr. 50). While waiting for the ambulance to arrive Venditti asked Jeremy some questions about what was going on. (Tr. 51). Venditti did not read him any *Miranda* rights at this point because he felt like he was still investigating what was happening. (Tr. 51). Venditti did not consider Jeremy under arrest. When asked about having any guns Jeremy clammed up and wouldn't talk or would just change the subject. (Tr. 52). Jeremy was transported to the local hospital.

After arriving at the hospital Jeremy was taken to a private room so he could be treated. (Tr. 74). The handcuffs were not removed and Jeremy's requests to go outside and have a smoke were denied. (Tr. 74). Venditti continued to question Jeremy at the hospital. (Tr. 76). Eventually Jeremy made some statements about carrying a weapon to protect himself from drug dealers. (Tr. 76).

Two other officers, Wells and Holmberg, arrived at the hospital. They watched Jeremy while Venditti stepped out to talk with Jennifer. (Tr. 75, 77). Jennifer told Venditti what had occurred during the day with Jeremy, Pansy and her father. Venditti also spoke with Officer

Wells who had responded to a trespass call several days earlier from Jennifer. (Tr. 77). Jennifer had asked for Jeremy to be removed from the property of one of her family members. Venditti decided to book Jeremy on charges of domestic violence stalking based on the recent events and the trespass from several days earlier.

After deciding to arrest Jeremy, Venditti decided to return to the hotel to get the guns. Vendetti asked Jennifer and her father to return with him. (Tr. 57). Venditti wanted the Harmons to return with him so that Jennifer could get a key. (Tr. 59). Venditti thought Jennifer had the authority to consent to enter the hotel room. (Tr. 59). When Venditti approached the desk clerk with the Harmons to get a key, the clerk refused because Jennifer was not a registered occupant of the room. The desk clerk told Venditti that Mr. Arrington (Jeremy) had come down after Jennifer left and had taken her name off the room. Venditti then called his sergeant seeking to obtain a warrant for the room. His request was denied. (Tr. 60).

Venditti returned and explained the situation to the desk clerk-the likelihood of guns being in the room and the strong possibility that Jeremy would return to the room in a "few hours" after being booked. (Tr. 60). The desk clerk then gave Venditti a key to open the room because he needed to stay at the front desk. During testimony Venditti could not remember whether he or Jennifer opened the door. (Tr. 61). Venditti conducted a search of the room and found two firearms in an armoire. (Tr. 62).

## DISCUSSION

The legal analysis here turns on the particular facts of this case. First, the court must determine whether Jennifer Arrington had actual legal authority to consent to a search of the motel room. Next, if she did not, then did Jennifer have apparent legal authority to consent to a

search upon which police could reasonably rely? Lastly, did exigent circumstances exist which would have allowed police entry into the motel room to search despite lack of consent.

The Fourth Amendment protects individuals from unreasonable searches and seizures.[4] Warrantless entries into people's houses, whether to make an arrest or to search for certain objects, are *per se* unreasonable and violate the Fourth Amendment. The constitutional prohibition against warrantless entries, however, does not apply in situations where police obtain voluntary consent from the individual whose property is searched[5] or from a third party who possesses common authority over the premises.[6] Overnight guests and joint occupants of motel rooms possess a reasonable expectation of privacy in their property.[7] And, a third party may give valid consent to search a common premises as long as the party has either actual or apparent authority.[8]

While this case presents a unique factual scenario, the court finds the evidence presented by the government satisfies its burden of proving Jennifer Arrington had actual authority to consent to the search of the motel room.

**I.    DID JENNIFER ARRINGTON HAVE ACTUAL AUTHORITY TO CONSENT TO THE SEARCH OF THE MOTEL ROOM**

Defendant Arrington argues that Jennifer had no actual authority to consent to the search

---

[4] *See* U.S. Const. Amend. IV.

[5] *See Schnekloth v. Bustamonte*, 412 U.S. 298 (1973).

[6] *See United States v. Matlock,* 415 U.S. 164, 171 (1974).

[7] *See United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004).

[8] *See Illinois v. Rodriguez,* 497 U.S. 177, 186-88 (1990).

of the motel room they occupied. The government does not argue in either its opening or supplemental brief that Jennifer had actual authority to consent, rather the government relies on Jennifer's apparent authority to consent upon which law enforcement reasonably relied in conducting the search.[9] Nonetheless, Defendant argues that the actual authority analysis is relevant to the determination of whether apparent authority existed. The court agrees with Defendant Arrington that the question of actual authority should be addressed but disagrees with the outcome argued by Defendant..

As accurately stated by Defendant Arrington in his memorandum, the question of whether a third party has actual authority to grant entry to law enforcement officers is determined by the *Matlock* test, restated by the Tenth Circuit in *United States v. Rith*.[10] The government bears the burden of establishing actual authority.[11] As set out in *Rith,* "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."[12]

Applying the *Matlock* test, the court finds that Jennifer Arrington and Defendant Jeremy Arrington had mutual use of the property by virtue of joint access as well as "control over the room for most purposes." According to the record, the motel room was being rented for the purpose of providing the couple a place to continue discussions about their troubled marriage.

---

[9] The court finds it would be inappropriate to not consider the question of "actual authority to consent" based on the evidence presented by the government despite the government's decision not to present legal argument as to the issue.

[10] 164 F.3d 1323, 1329 (10th Cir. 1999).

[11] *See Rodriguez,* 297 U.S. at 181.

[12] *Rith*, 164 F.3d at 1329.

The Arringtons attempted to check in together at the La Quinta motel as husband and wife. But failed because neither had a valid ID. Instead, Defendant Arrington's mother, Pansy Arrington, showed her ID which allowed the couple to rent a room. Jennifer paid for a single day's rental rate-$60 plus tax-and gave a $20 security deposit for the room while Defendant Jeremy Arrington was given the apparent single key issued at the time of check in. Defendant Arrington took "some bags" to the room but there is no evidence that Jeremy intended to spend the night;[13] Jennifer took her purse and a cell phone. Shortly after entering the room and beginning to talk, Jennifer left the room to meet her father. She took her cell phone and purse. As she left, Defendant Arrington was holding a gun to his head asking for her to return. Jennifer testified that she intended to leave and not return but did express some reservations about leaving because she was afraid of what Defendant might do to himself. Jennifer testified that she considered going back but at the insistence of her father did not. She and her father drove down the street from the motel and called police. Shortly thereafter Jeremy was taken into police custody after he was seen by police walking down the street in the direction of his wife's office building. After learning that Defendant Arrington had been taken into custody, Jennifer and her father returned to the motel with the police intending to get any firearm left in the room.

      Based upon the evidence before it, the court finds Jennifer Arrington had joint access as well as control over the motel room with her husband, Defendant Jeremy Arrington. In the court's view, the Arringtons stand in virtually the same position as joint occupants of the room. The room was rented for a mutual and limited purpose. Check-in was accomplished mutually.

---

[13] The record contains no reference as to how long Defendant Arrington planned to stay at the motel or whether he intended to spend the night.

The single key, while in the actual physical possession of Defendant, was distributed in their joint presence for the purpose of allowing them mutual access to the room. Both took personal belongings into the room. They entered together and remained in the room together until Jennifer left to meet her father. Shortly thereafter Defendant also left–although he did leave bags and firearms in the room. The fact that Defendant maintained the single key issued to the couple is not persuasive.[14, 15]

For the above-stated reasons, the court finds that the requirements of the *Matlock* test-requiring establishment of joint mutual access and control over the room for most purposes-have been met. Jennifer Arrington had actual authority to consent to a search by reason of her joint mutual access to the room and control for most purposes over the room equal to that of her co-occupant husband.

II.  **DID JENNIFER ARRINGTON HAVE APPARENT AUTHORITY TO CONSENT UPON WHICH POLICE COULD REASONABLY RELY**

Based upon the court's finding that Jennifer Arrington had actual authority to consent to law enforcement's entry into and search of the motel room shared with her husband, it is not necessary to analyze the apparent authority issue. Such analysis would necessitate evidence before the court that in conducting the search law enforcement relied , <u>although erroneously</u>, on

---

[14] In similar fashion the court finds the fact that Defendant Arrington requested the motel's desk clerk remove his wife's name from the hotel registration not significant to the legal analysis because the only name on the registration document was "Pansy Arrington" and Defendant, himself, had no authority to request anyone's name be either deleted or added.

[15] The fact that Detective Vendetti made a call to his superior officer requesting a warrant is not significant as the record does not explore the reason why the warrant request was denied. It is further irrelevant to the question of Ms. Arrington's actual authority to consent.

the apparent authority of Ms. Arrington to consent to the search.[16]  No evidence of mistaken or erroneous belief has been presented.

**III.     DID EXIGENT CIRCUMSTANCES EXIST JUSTIFYING LAW ENFORCEMENT'S  WARRANTLESS ENTRY INTO DEFENDANT'S ROOM TO JUSTIFY THE SEARCH**

The court requested the parties supplement their initial memoranda with legal briefing as to whether the search of the motel room could be justified under the public safety exigent circumstances exception to the warrant requirement.  Viewing the requirements of a public safety exigency in light of the facts of this case, the court finds no exigent circumstances sufficient to justify the warrantless entry into Defendant's Arrington's motel room.

A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment.[17]   It is beyond dispute that people staying in motel rooms generally have a reasonable expectation of privacy and are afforded Fourth Amendment protections.[18]  The government bears the burden of demonstrating exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.[19]

As the Tenth Circuit ruled in *Zogmaister*,[20] exigent circumstances can justify a warrantless search in any one of four situations: 1) when there is probable cause for the search or

---

[16] *See Rodriguez*, 497 U.S. 177, 186-88 ( 1991 ).

[17] See *Payton v. New York*, 445 U.S. 573, 586 (1980).

[18] *See United States v. Zogmaister*, 90 Fed. Appx. 325, 328 (10th Cir. 2004).

[19] *See Jones v.United States*, 357 U.S. 493 (1958).

[20] 90 Fed. Appx. At 329 (citing references omitted).

seizure, and the evidence is in imminent danger of destruction;  2) the safety of law enforcement or the general public is threatened; 3) the police are in "hot pursuit" of a suspect; or 4) a suspect is likely to flee before the officer can obtain a warrant.

While the Tenth Circuit has found "no absolute test for the presence of exigent circumstances,"[21] it has provided a general framework for analyzing the public safety exigency: 1) the law enforcement officers must have reasonable grounds to believe there is immediate need to protect their lives or others or their property or that of others; 2) the search must not be motivated by an intent to arrest and seize evidence; and 3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.[22] The government must establish that Detective Venditti had reasonable grounds to believe the firearms in Jeremy's unoccupied motel room posed an immediate threat to Jeremy, police, or other members of the public.[23]

The court finds insufficient evidence of a public safety exigency to justify the police entry into the motel room.  The record establishes Defendant was in police custody and therefore did not immediately constitute a danger to himself or any other person or persons that could not have been addressed by other legal means.  Further, the record as developed reflects the purpose of the search was to seize evidence, i.e., the firearm believed to be inside the room.  Therefore, the search cannot be justified on grounds of exigency.

## CONCLUSION

---

[21] *United States v. Justice*, 835 F.2d 1310, 1312 (10th Cir. 1987).

[22] *See United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986).

[23] *See id.*

11

Based on the foregoing, the Court HEREBY RECOMMENDS that Defendants' Motion to Suppress be DENIED.

Copies of the foregoing report and recommendation are being mailed to all parties who are hereby notified of their right to object. The parties must file any objection to the Report and Recommendation within ten days after receiving it. Failure to object may constitute a waiver of objections upon subsequent review.

DATED this  12th  day of June, 2006.

BY THE COURT:

_____
BROOKE C. WELLS
United States Magistrate Judge